[EDITOR'S NOTE: This case is unpublished as indicated by the issuing court.] MEMORANDUM OF DECISION
CT Page 8781
This is an appeal from a decision by the defendant denying the plaintiff's combined applications for an amendment to the zoning regulations, zone change and site plan approval regarding a proposal to construct forty-eight, later reduced to forty, residential units on property comprising 0.7 acres. The appeal is taken pursuant to Connecticut General Statutes § 8-30g.
General Statutes § 8-30g provides in part as follows:
 Sec. 8-30g. Affordable housing land use appeals procedure. (a) As used in this section (1) "Affordable housing development" means a proposed housing development (A) which is assisted housing or (B) in which not less than twenty-five per cent of the dwelling units will be conveyed by deeds containing covenants or restrictions which shall require that such dwelling units be sold or rented at, or below, prices which will preserve the units as affordable housing, as defined in section 8-39a, for persons and families whose income is less than or equal to eighty per cent of the area median income or eighty per cent of the state median income, whichever is less, for at least thirty years after the initial occupation of the proposed development; (2) "affordable housing application" means any application made to a commission in connection with an affordable housing development by a person who proposes to develop such affordable housing; (3) "assisted housing" means housing which is receiving, or will receive, financial assistance under any governmental program for the construction or substantial rehabilitation of low and moderate income housing, and any housing occupied by persons receiving rental assistance under chapter 138a or Section 1437f of Title 42 of the United States Code; (4) "commission" means a zoning commission, planning commission, planning and zoning commission, zoning board of appeals or municipal agency exercising zoning or planning authority; and (5) "municipality" means any town, city or borough, whether consolidated or unconsolidated.
 (b) Any person whose affordable housing application is denied or is approved with restrictions which have a substantial adverse impact on the viability of the affordable housing development or the degree of affordability of the affordable dwelling units, specified in subparagraph (B) of subdivision (1) of subsection CT Page 8782 (a) of this section, contained in the affordable housing development, may appeal such decision pursuant to the procedures of this section. . . .
 (c) Upon an appeal taken under subsection (b) of this section, the burden shall be on the commission to prove, based upon the evidence in the record compiled before such commission that (1)(A) the decision from which such appeal is taken and the reasons cited for such decision are supported by sufficient evidence in the record; (B) the decision is necessary to protect substantial public interests in health, safety, or other matters which the commission may legally consider; (C) such public interests clearly outweigh the need for affordable housing; and (D) such public interests cannot be protected by reasonable changes to the affordable housing development or (2)(A) the application which was the subject of the decision from which such appeal was taken would locate affordable housing in an area which is zoned for industrial use and which does not permit residential uses and (B) the development is not assisted housing, as defined in subsection (a) of this section. If the commission does not satisfy its burden of proof under this subsection, the court shall wholly or partly revise, modify, remand or reverse the decision from which the appeal was taken in a manner consistent with the evidence in the record before it.
 (d) Following a decision by a commission to reject an affordable housing application or to approve an application with restrictions which have a substantial adverse impact on the viability of the affordable housing development or the degree of affordability of the affordable dwelling units, the applicant may, within the period for filing an appeal of such decision, submit to the commission a proposed modification of its proposal responding to some or all of the objections or restrictions articulated by the commission, which shall be treated as an amendment to the original proposal. The filing of such a proposed modification shall stay the period for filing an appeal from the decision of the commission on the original application. The commission may hold a public hearing and shall render a decision on the proposed modification within forty-five days of the receipt of such proposed modification. . . .
 (f) Notwithstanding the provisions of subsections (a) to (e), CT Page 8783 inclusive, of this section, the affordable housing appeals procedure established under this section shall not be available if the real property which is the subject of the application is located in a municipality in which at least ten per cent of all dwelling units in the municipality are (1) assisted housing or (2) currently financed by Connecticut Housing Finance Authority mortgages or (3) subject to deeds containing covenants or restrictions which require that such dwelling units be sold or rented at, or below, prices which will preserve the units as affordable housing, as defined in section 8-39a, for persons and families whose income is less than or equal to eighty per cent of the area median income. The Commissioner of Economic and Community Development shall, pursuant to regulations adopted under the provisions of chapter 54, promulgate a list of municipalities which satisfy the criteria contained in this subsection and shall update such list not less than annually.
The court finds the following facts. The plaintiff at all material times held an option to purchase the property in question and, as such, is an aggrieved party. He sought revised approval to construct a forty unit multiple high-rise apartment building on a 0.7 acre of land located in both the Town of Stratford and City of Bridgeport. The parcel of land involved in the application is partially in Bridgeport, but the building is located on land in Stratford at 520 Success Avenue. Eight of the proposed parking spaces are located on a portion of the land in question that is located in the City of Bridgeport. The sewer and drainage connection is also located in the City of Bridgeport. The plaintiff proposed an amendment to the Stratford Zoning Regulations to establish an "Affordable Housing Opportunity Zone" (AHOZ) for the purpose of providing housing for senior citizens and the elderly. A minimum of 25 percent of the units would be dedicated as affordable housing for a period of thirty years. The plaintiff's application also sought to amend the zone of the subject property from its present designation as CA district which is commercial to the AHOZ zone. The plaintiff also filed a site plan in order to complete the zone change application which contained various data including setbacks, height, parking, landscaping, layout of units and size of units. The plaintiff's initial submission was for a seven story forty-eight unit structure. The plaintiff resubmitted his application and reduced the height to six stories and the number of units to forty housing units, as well as other changes. CT Page 8784
The court finds the following additional facts:
The Connecticut Department of Housing established the fact that out of the 1992 estimated housing units of 20,281 units in Stratford, only 1,574 are affordable housing units which amounts to 7.8 percent.
In 1993, the Town of Stratford adopted a plan of development entitled "Stratford Visions: 2001." That plan set a goal of 446 units of affordable housing to be constructed by the year 2001. Of the 446 units, 149 were to be for the elderly. None of these units of affordable housing have been approved or constructed since the adoption of the plan of development. The plaintiff's project is located in a CA commercial zone. It has an old store and warehouse building located on the property. The property is surrounded by stores and by public housing projects and private housing projects.
The Commission notified the plaintiff of its denial by letters dated October 18, 1995. Those letters stated as follows:
Dear Sir:
 This is to officially notify you that at a meeting of the Zoning Commission held October 17, 1995, it was voted to deny your petition to amend the zoning regulations of the Town of Stratford by establishing a new section number 26 entitled "Affordable Housing Opportunity Zone."
The Commission further wrote to the applicant by letter dated October 18, 1995 as follows:
Dear Sir:
 This is to officially notify you that at a meeting of the Zoning Commission held October 17, 1995, it was voted to deny your petition for a change of zone from a CA District to an affordable housing opportunity zone (AHOZ) at 520 Success Avenue.
Following notice of the actions of the Commission, the applicant submitted revisions to the proposed "Affordable Housing Opportunities Zone" zoning regulations and to the site plan that was submitted pursuant to such regulations. This procedure is CT Page 8785 authorized under the provisions of Z 8 30g (d). The Commission had previously held a public hearing on the original submitted application on August 22, 1995. The Commission reviewed the revised regulations and plans at its meeting of December 11, 1995. The applicant stated that the revisions to the proposed regulations and plans were as follows:
 1. In Section 26.2 A we have limited the occupancy of the units to elderly persons and senior citizens as defined in Section 26.1.1.
 2. In Section 26.5 Density we have specifically stated that the density shall not exceed 40 housing units.
 3. In Section 26.6 we have reduced the building height to 70 feet including the projection over the top floor or 60.4 feet for the 6 stories.
 4. Section 26.10.3 we have added provisions requiring the delineation of any walkways, driveways on the site plan.
 5. Section 26.12.1 has been modified and amended by reducing the size of the building to six (6) stories with a height of seventy (70) feet.
 6. Section 26.11.2 we have repeated the proposed section to provide that all work in connection with the site plan shall be completed within five (5) years after approval of the plan.
 7. The revised site plan shows 40 tenant car spaces and 8 visitor spaces.
 8. Revised PR-2 shows six stories with height of 60.4 feet for the 6th floor.
9. PR-4 shows meeting room or indoor recreation rooms.
10. PR-6 shows rooftop recreation area of 6,200 square feet.
Gary Lorentson, planning and zoning administrator for the Town of Stratford, explained to the Commission members the changes that were made in the applicant's proposal at the meeting of the applicant on December 11, 1995. In explaining paragraph four of the revisions to the proposed regulations and site plan, he stated to the Commission as follows: "their site plan they say they've added provisions requiring delineation of sidewalks, CT Page 8786 driveways on the site plan. They were shown before."
The revised modified site layout plan, dated June 11, 1995, regarding revisions to drawing number PR-1 states that the landscaped area was to be 7600 square feet, which amounts to approximately 24 percent of the total lot area. The prior site plan layout, drawing No. PR-1, dated May 2, 1994, shows areas of landscaping but did not state what the square feet of landscaping area was.
The minutes of the Stratford Zoning Commission meeting of October 17, 1995 state in part as follows:
 Therefore, on a motion by Mr. Hess seconded by Mr. Torre, it was voted to deny the petition of Gerard Nucera d/b/a Helping Way to amend the Zoning Regulations of the Town of Stratford by establishing a new section number 26 entitled "Affordable Housing Opportunity Zone," based on the Memorandum of Decision prepared by the Town Attorney's office and attached to these minutes.
This petition was denied on a 5-0 vote.
The minutes further reflect the following:
 Therefore, on a motion by Mr. Hess seconded Ms. Pinkerton, it was voted to deny the petition of Gerard Nucera d/b/a Helping Way for a change of zone from a CA District to an Affordable Housing Opportunity Zone (AHOZ), at 520 Success Avenue.
 This petition was denied on a 5-0 vote based on all information presented and also on the Memorandum of Decision prepared by the Town Attorney's Office and attached to these minutes.
The Memorandum of Decision prepared by the Town Attorney's Office, adopted by the Commission, gave the following reasons for the denial of the plaintiff's application:
III. THE DECISION
 The Commission has considered the testimony, evidence and exhibits, and has deliberated on these matters. After due consideration, the petitions are denied for the reasons set forth below. CT Page 8787
 A. Proposed Regulation — Section 26 Affordable Housing Opportunity Zone
 1. The stated purpose and intent of this regulation is to promote elderly, affordable housing at extremely high density by minimizing site development costs. No reference is made to Section 20 of the Stratford Zoning Regulations, which is designed to protect health, safety and welfare issues. The proposed standards for site development do not include such important considerations as the location and number of driveways, traffic signalization, internal circulation of vehicular and pedestrian traffic, and landscaping/buffering requirements.
 Accordingly, we find that the proposed regulation is deficient in that the public's health, safety and welfare interests are not well served.
 2. The proposed regulation contains no standards for the Planning and/or Zoning Commission to utilize during its site plan review or in determining the propriety of a zone change. The procedures outlined in Sections 26.10 and 26.11 regarding zone changes is vague and absent of any standards whatsoever. Additionally, Section 26.12 contains no objective guidelines to be utilized by the Commission in reviewing site plans. The proposed regulations merely recite general standards which are inadequate to guide the Commission and to enable those affected by the regulations to know and understand their rights and obligations. The Commission, in considering a zone change, needs to have information concerning surrounding land uses, existing densities of development in surrounding areas, existing and projected traffic levels, and physical characteristics of the subject property at a minimum. For housing developments such as this, transit availability, park and recreational facilities in the vicinity, and supporting retail and convenience services would certainly be desirable.
 Accordingly, we find that the proposed regulation is deficient in that it establishes no more than vague and general standards.
 3. The proposed regulation (Section 26.11.1) provides that construction must begin within five years of the date of zoning approval, which conflicts with the provisions of Conn. General Statutes 8-3(i).
 4. The proposed regulation contains no maximum density limits. Additionally, the proposed regulation fails to establish a method for calculating density limits. Furthermore, the petitioner has provided no evidence or testimony concerning economic feasibility of the project as CT Page 8788 proposed, or of such a project under current regulations. The petitioner offered no evidence concerning the land, loan, construction, operational and utility costs involved with the proposed project, which would enable the Commission to assess the mathematic function between economic feasibility and density.
 In reaching our decision that the unlimited density levels provided for in the current regulation and the site plan are too high, we are guided by the current Town Land Use Plan. Stratford's land use policies indicate high density residential developments at a density of five to eleven dwelling units per acre. The surrounding area includes a mix of uses ranging from single-family residential to multi-family residential, and commercial uses. Existing residential densities in the immediate vicinity average between 2.5 dwelling units per acre to 6.17 dwelling units per acre. The proposed regulation offered by the petitioner would provide for an unlimited density.
 5. The proposed standards for site development do not include such important considerations as the location and number of driveways, and landscaping and/or buffering requirements. The proposed regulation would permit impervious surfaces to cover 100% of the lot area and no minimum value is established for landscaping, open space and recreational space. Additionally, maximum building height under current Regulations is set at 35 feet; the petitioner's proposal provides for 82 feet, which is approximately 300% greater than that height currently permitted. The buildings set backs established by the proposed regulation, ranging from 15 to 25 feet, are extremely small when evaluating a building 82 feet in height.
 6. The proposed regulation provides for one parking space per unit, which is inadequate not only for residents, but for guests and service providers as well. Being that there is no provision in the proposed regulation mandating occupancy by elderly individuals exclusively, the petitioner has offered no evidence obviating the need for a one space per unit parking requirement.
B. Proposed Zone Change
 1. The zone change application submitted by the petitioner is deficient in many respects. The maps submitted in connection with the application do not provide sufficient information concerning existing zone designations adjoining this parcel, and do not clearly delineate the proposed boundaries for the new Affordable Housing Opportunity Zone. Under the AHOZ regulation as written, there is no evidence that the proposed development would be consistent with, or blend with, the CT Page 8789 Town's Land Use Plan or the existing density levels prevailing in the established neighborhood. While the current Town Land Use Plan proposes high density residential development at this site, it recommends a density of five to eleven dwellings units per acres. The surrounding area includes a mix of uses, ranging from single-family residential to multi-family residential, and commercial uses. Existing residential densities in the vicinity average between 2.5 dwelling units per acre to 6.17 dwelling units per acre.
 2. Approximately one-third of this site is located in the City of Bridgeport, and the petitioner has not demonstrated that the City of Bridgeport would permit the proposed use of this site for this purpose.
 3. The petitioner has not demonstrated that the portion of land lying within the boundaries of the City of Bridgeport could be dedicated to this particular project. Without the Bridgeport land, the proposed development only has 40 parking spaces and not the 48 parking spaces required under the petitioner's own amendment.
 4. Rezoning this parcel, which comprises roughly 0.5 of an acre, to a use which is inconsistent with the Town Land Use Plan and the Comprehensive Plan constitutes "spot zoning."
C. Proposed Site Plan
 1. DENSITY. This site plan proposes a housing development of 48 units at a density of 96 dwelling units per acre. The proposed density is significantly above the scale anticipated in the Town's Land Use Plan, and much higher than the density of the surrounding neighborhood. As a consequence, this development is inconsistent with the following policies of the Town Plan of Development:
 (a) Residential neighborhoods should be protected from blighting causes, such as incompatible land uses;
 (b) Careful consideration should be given to the density and scale of proposed developments in determining a project's impact on surrounding areas;
 (c) Encourage land uses which will be compatible with the scale and types of land uses pre-existing within a neighborhood. Conversely, discourage or limit proposed land CT Page 8790 uses which are out of scale and character within a surrounding neighborhood.
 2. LAND USE MANAGEMENT. The petitioner has not demonstrated the compatibility of this proposal with the Zoning Regulations of the City of Bridgeport. It would be unwise for the Town to accept unrestricted parking spaces located in another community to satisfy its own parking requirements unless the property located in Bridgeport is specifically zoned for a use compatible with that proposed by the petitioner.
 Accordingly, we find that only 40 parking spaces are being provided for this project as opposed to the 48 spaces required under the petitioner's own regulation. Since the regulation does not require residency by elderly persons, the site plan is inadequate with regard to parking. At less than one parking space per unit, the site plan is also inadequate with regard to parking when compared to the petitioner's own regulation.
 3. TRANSPORTATION. The petitioner submitted a minimal traffic study which suggests approximately 130 vehicular trips during an average day. The trip generation estimates established by the Town is approximately 300 to 550 vehicular trips per day for unrestricted apartments, and approximately 120 to 130 average trips per day for elderly housing. Since these units are not restricted to elderly individuals, the total traffic impact could be well over four times greater than the volume represented by the petitioner.
 4. SEWER CAPACITY. The City of Bridgeport Water Pollution Control Authority noted that past history indicates the area to have system capacity limitations due to the building density in that area and that approval cannot be provided until a detailed review of flow calculations is provided. Furthermore, an attorney on behalf of neighboring Success Village Apartments confirmed a recent incident regarding a sewer line malfunction where raw sewage was spilled from a broken line. Given the significant density proposed, we have a serious public health concern on the adequacy of the existing sewer system.
5. OTHER SITE FEATURES.
 A. Building height of 82 feet is approximately 2.5 times greater than the maximum permitted height of any residential building allowed under current zoning regulations (35 feet).
 B. The current proposed site plan provides no outdoor recreational CT Page 8791 space.
 C. The close proximity of the proposed structure to adjoining residential and commercial buildings would block the afternoon and morning sun for the occupants of those buildings.
 D. The valuation analysis submitted by the Charles Pitcher Appraisal Company only compared and analyzed properties adjoining one Stratford elderly housing complex (Lucas Gardens). While Lucas Gardens was the last elderly housing complex to be built, it is only one-story in height and we find that a seven-story housing complex will adversely affect surrounding property values.
IV. CONCLUSION
 On the basis of the evidence contained in the record, we believe that our decision to deny the petitions is necessary to protect substantial public interests in health, safety and welfare. We believe that our decisions to deny these petitions are necessary in order to protect our citizens from the health risks associated with inadequate sanitary sewer facilities, overly crowded living conditions, and inadequate parking. Furthermore, we must conclude that the many deficiencies recited herein with regard to the proposed regulation, the proposed zone change, and the petitioner's site plan clearly outweigh the need for an affordable housing proposal of this magnitude. Mindful that many residents in the immediate vicinity of 520 Success Avenue offered strong opposition to the petitioner's proposal, the Commission recognizes not only the need to develop affordable housing for the less affluent citizens of our Town, but that this location represents a potentially good site for such a development; however, the Commission also recognizes that this site has been previously approved for the construction of fourteen housing units which may be modified to provide affordable housing. Furthermore, the petitioner did not demonstrate economic need for the high density proposed for this project in spite of a specific request from the Commission to do so. Conversely, estimates prepared by Town official show monthly housing expenses under the statutory definition of affordable housing range from $800 to $1000 per month. Moreover, according to the Tax Assessor's estimates, a development of fourteen units on this site would support new construction costs on an unsubsidized basis with a rent level of $800 per month, which is well within the acceptable range CT Page 8792 of affordable limits. Consequently, the petitioner has offered no evidence that would permit the Commission to determine economic need for a density level which is significantly higher than the density levels recommended by the Town Land Use Plan Finally, evidence from the Greater Bridgeport Regional Planning Agency and the Center for Independent Living indicate many concerns regarding the suitability of this project for elderly housing.
Respectfully Submitted,
In discussing the procedure to be followed in an appeal under § 8-30g, West Hartford Interfaith Coalition, Inc. v. TownCouncil, 228 Conn. 498 (1994), the court stated in part at page 513 as follows:
 "Where a zoning [commission] has stated its reasons for its actions, the court should determine only whether the assigned grounds are reasonably supported by the record and whether they are pertinent to the considerations which the authority was required to apply under the zoning regulations. . . . The zone change must be sustained if even one of the stated reasons is sufficient to support it. . . . The principle that a court should confine its review to the reasons given by a zoning commission does not apply to any utterances, however incomplete, by the members of the [commission] subsequent to their vote. [Rather, it] applies where the [commission] has rendered a formal, official, collective statement of reasons for its action." Thus, "where a zoning commission has formally stated the reasons for its decision, the court should not go behind that official collective statement . . . [and] attempt to search out and speculate upon other reasons which might have influenced some or all of the members of the commission to reach the commission's final collective decision." [Citations omitted; internal quotation marks omitted.]
In the minutes of the Stratford Zoning Commission meeting of December 11, 1995 is found the following:
 After further discussion a motion was made by Mr. Hess seconded by Mrs. Lawrence to deny the amended regulation and site plan as the Commission felt that the minor revisions made did not go far enough in addressing the Commission's concerns as stated in their original memorandum of decision. This motion carried on a 5-0 vote.
CT Page 8793
The letter to the counsel for the plaintiff of December 15, 1995 notifying the plaintiff of the Commission's denial, stated as follows:
December 15, 1995
 Lesser Sobel, P.C. 1000 Lafayette Boulevard Bridgeport, CT 06604
 ATTENTION: Robert K. Lesser
RE: 520 Success Ave., Stratford, Amended Application
Dear Mr. Lesser:
 At a meeting of the Zoning Commission held December 11, 1995 the amended regulation creating a new "Affordable Housing Opportunity Zone" and amended site plan for the project were reviewed and discussed under Section 8-30g(d) of the State Statutes.
 The Commission formally voted to deny the amended regulation and site plan as they felt that the minor revisions made did not go far enough in addressing the Commission's concerns as stated in their original Memorandum of Decision.
Regards,
 GARY LORENTSON Planning Zoning Administrator ZONING COMMISSION
As shown above, both the letter to counsel for the applicant, dated December 15, 1995, as well as the minutes of the meeting of the Stratford Zoning Commission of December 11, 1995, stated that the Commission felt that the minor revisions made through the amended regulations and site plan did not go far enough in addressing the Commission's concerns as stated in their original Memorandum of Decision. However, the transcribed minutes of the meeting of the Stratford Zoning Commission of December 11, 1995 shows that Chairperson Youngquist phrased the motion to deny the application "based on all of the comments made including the professional staff comments and the lack of all the things Charlie said including the lack of financial specifics, CT Page 8794 affordability and the deficiencies mentioned on all the other items that were requested."
The reference by Chairperson Youngquist in the transcribed minutes of the Administrative Session of the defendant Commission of December 11, 1995 to "Charlie" is a reference to Charles Hess, a member of the Commission.
A preliminary issue before the court is whether the reasons for the denial of the plaintiff's application, as stated in the December 15, 1995 letter to the applicant, as well as the minutes of the defendant's meeting of December 11, 1995, both of which refer to the Memorandum of Decision prepared by the Town Attorney's Office, or whether the reasons for the denial are the reasons stated in the transcribed minutes of the defendant's December 11, 1995 meeting. This court holds that the transcribed minutes of the defendant's December 11, 1995 meeting, reflect the true collective statement of reasons by the defendant for its action in denying this application. This court has therefore searched the record of the official transcript of the defendant's meeting of December 11, 1995 to determine the comments made, including professional staff comments and the lack of all of the things that Commission member Hess said at the December 11, 1995 meeting, including the lack of specifics, affordability and the deficiencies mentioned to determine the grounds for denial. This court has also searched the official transcript of the public hearing of August 22, 1995 to determine what deficiencies were mentioned on the other items that were requested by the Commission at that public hearing to determine the grounds for denying the application. This court has also searched the record to determine whether the assigned grounds for denial are reasonably supported by the record and whether they are pertinent to the considerations which the authority was required to apply under the zoning regulations.
A review of the official transcript of the Stratford Zoning Commission Administrative Session held on December 11, 1995, and the of official transcript of the public hearing of August 22, 1995 shows that the grounds for denying the application fall into the following categories: (a) affordability and lack of financial specifics; (b) traffic; (c) internal movement of pedestrians and vehicular traffic and parking; (d) emergency access; (e) landscaping; (f) recreational area; (g) size of units; (h) density; (i) section 20 of existing regulations; (j) building height; (k) sewage disposal; and (l) storm runoff; CT Page 8795
In holding that § 8-30g and its legislative history and circumstances surrounding its enactment and the purpose for which it was designed, was intended to apply to legislative zone changes. The West Hartford Coalition. Inc. court at pages 510-511 stated in part as follows:
 In addition, during the floor debate in the House of Representatives, various legislators explicitly discussed the applicability of the appeals procedure contained in 8-30g to legislative decisions, and in particular to zone change applications. At least one legislator voiced opposition to 8-30g
on the basis of the statute's applicability to zone changes. 32 H.R. Proc., Pt. 30, 1989 Sess., p. 10,630, remarks of Representative James Fleming. Of special significance is the response of Representative William Cibes to a question from Representative Robert Farr about a proposal to develop multifamily housing in a single-family zone and whether such a proposed change in the underlying zone would be "in itself a basis for denial." Representative Cibes stated: "[T]he answer is no, not per se. The municipality might have very good grounds for not having multifamily dwellings in the particular area. The soil type, the capacity of the infrastructure, various reasons such as that might have been a reason for the municipality not to adopt a particular zone for that particular area, but per se, there would not — it would not [be] a reason for rejecting this application. [Emphasis provided.]
 Our review of the statute's legislative history reveals that the key purpose of § 8-30g is to encourage and facilitate the much needed development of affordable housing throughout the state.
Similarly in Wisniowski v. Planning Commission,37 Conn. App. 303 (1995), the court at page 312 stated as follows:
 Our conclusion is that the plain and unambiguous language of § 8-30g does not contemplate a denial of an affordable housing subdivision application on the ground that it does not comply with the underlying zoning of an area.
Under the provisions of § 8-30g (c), the burden is "on the commission to prove, based upon the evidence in the record compiled before such commission that (1)(A) the decision from which such appeal is taken and the reasons cited for such decision are supported by sufficient evidence in the record; (B) CT Page 8796 the decision is necessary to protect substantial public interests in health, safety, or other matters which the commission may legally consider; (C) such public interests clearly outweigh the need for affordable housing; and (D) such public interests cannot be protected by reasonable changes to the affordable housing development. . . ." If the Commission does not satisfy its burden of proof under this subsection, the court shall wholly or partly revise, modify, remand or reverse the decision from which the appeal was taken in a manner consistent with the evidence and the record before it.
The statutory mandate of § 8-30g (c) requires the court to consider the following issues:
1. THE ISSUE OF WHETHER THE DECISION FROM WHICH THIS APPEAL IS TAKEN AND THE REASON CITED FOR SUCH DECISION ARE SUPPORTED BY SUFFICIENT EVIDENCE IN THE RECORD.
2. THE ISSUE OF WHETHER THE DECISION IS NECESSARY TO PROTECT SUBSTANTIAL INTEREST IN PUBLIC HEALTH, SAFETY OR OTHER MATTERS WHICH THE COMMISSION MAY LEGALLY CONSIDER.
3. THE ISSUE OF WHETHER SUCH PUBLIC INTEREST CLEARLY OUTWEIGH THE NEED FOR AFFORDABLE HOUSING AND
4. THE ISSUE OF WHETHER SUCH PUBLIC INTERESTS CANNOT BE PROTECTED BY REASONABLE CHANGES TO THE AFFORDABLE HOUSING DEVELOPMENT.
A. Affordability and Lack of Financial Specifics
The defendant's brief makes the following claim in support of this issue:
 With density of the project being a major concern, the Petitioner's modified proposal did not provide additional information concerning the proposal's "affordability" so that the zoning staff could evaluate the mathematic function between economic feasibility and density pursuant to Section 26.5 of the proposed amendments. At the public hearing, the Plaintiff offered no evidence whatsoever concerning the need to develop forty-eight (later forty) units. In fact, when the Plaintiff's representative was asked to give financial data concerning the project's affordability, the Plaintiff's respondent refused to respond. (ROR #28 — Transcript Public Hearing, pp. 54-57.) CT Page 8797
 Conversely, the Town Planning Administrator, Dave Killeen, provided testimony and documentary evidence showing that a much lower density level would support the Plaintiff's stated goal of providing affordable housing. Mr. Killeen's analysis included median income levels developed by the Department of Housing and a property evaluation analysis prepared by the Town Assessor's Office. His calculations were then compared to a smaller project which had been previously approved for the construction of fourteen units at the same site. The ultimate conclusion reached by Mr. Killeen is that fourteen units could be built on the subject property and still meet the statutory criteria for affordability. (ROR #28 — Transcript of Public Hearing, pp. 63-66.)
 It seems as though the Petitioner's representative misinterpreted the Commission's questions concerning economic feasibility as a challenge to affordability pursuant to Connecticut General Statutes § 8-30g (a). Not so. The Commission was merely seeking information to enable it to assess the proposal's density ratio. In any event, in light of the Supreme Court's analysis in West Hartford Interfaith Coalition. Inc. v. Town Council, 228 Conn. 498 (1994), the Commission could properly receive information concerning "affordability" pursuant to § 8-30g (a).
 Due to the Commission's inability to assess the mathematical function between density and economic feasibility, it was impossible for the Commission to make changes to the affordable housing development and still protect the public interests in health and safety. C.G.S. § 8-30g (c)(4).
The court is not persuaded by that argument.
The threshold issue is whether the plaintiff's housing application constituted an affordable housing development within the meaning of § 8-30g (a). An affordable housing development is a proposed housing development that is either an assisted housing, or in which not less than 25 percent of the dwelling units will be conveyed by deeds containing convenants or restrictions which shall require that such housing unit be sold or rented at, or below, prices which preserve the units as affordable housing, as defined in § 8-39a, for persons and families whose income is less than or equal to 80 percent of the area median income or 80 percent of the state median income, whichever is less, for at least thirty years after the initial occupation of the proposed development. . . ." In order for an affordable housing development to constitute assisted housing, it must be housing which is receiving, or will receive, financial CT Page 8798 assistance under any governmental program for the construction or substantial rehabilitation of low and moderate income housing, and any housing occupied by persons receiving rental assistance under chapter 138a or Section 1437f of Title 42 of the United States Code. There is no evidence in the record that this application meets the financial assistance requirement of § 8-30g
(a)(1)(A). However, the alternate 25 percent requirement of §8-30g (a)(1)(B) is met in this application. Section 26.1.4 of the proposed regulations provide as follows:
 An affordable housing development shall be deemed to mean a housing development which is "assisted housing" as defined in Conn. Gen. Stat. § 8-30g(a)(3); or (b) in which not less than twenty-five percent (25%) of the dwelling units will be held or conveyed by deeds containing convenants or restrictions which shall require that such dwelling units will be sold or rented at or below prices which will preserve the units as affordable housing as defined in § 8-39a of the Connecticut General Statutes, for persons and families whose income is less than or equal to eighty percent (80%) of the area median income or eighty percent (80%) of the State median income, whichever is less, for at least thirty years after the initial occupation of the proposed development.
The defendant seeks to connect the issue of affordability with the issue of density in claiming that the West HartfordInterfaith Coalition case allows the Commission to receive information concerning "affordability" to enable it to assess the proposal's density ratio. There is nothing in the West HartfordInterfaith Coalition case that connects affordability to density. The reference to affordability in the West Hartford InterfaithCoalition case has to do with § 8-30g (a)(1)(A) regarding assisted housing. However, a proposed housing development also meets the definition of "affordable housing development" as long as it meets the 25 percent requirement of § 830g (a)(1)(B).
This court also concludes that lack of financial specifics is not necessary to protect substantial interest in public health, safety or other matters which the Commission may legally consider in this case due to the fact that this applicant meets the requirements of being an affordable housing development under § 8-30g (a)(1)(B).
B. Traffic
The court finds that the traffic reason cited for the decision is not supported by sufficient evidence in the record. CT Page 8799 Part of the record (Exhibit 17) included a report from Harry B. Boutwell. P.E., a highway traffic consultant. He concluded, based on the original proposed forty-eight units of elderly housing that that would result in 130 vehicular trips during an average day, and that the peak highway hour travel would amount to only eight trips during the late afternoon peak highway hour. He further concluded that after a careful review of the existing traffic conditions within this neighborhood and the estimated travel associated with the proposed development, that it was his opinion that no significant traffic impact would result from the proposed additional elderly housing units within this neighborhood. There was no credible evidence submitted to the Commission to dispute those conclusions. Further, the reduction in the number of units from forty-eight to forty will result in even less traffic.
C. Internal Movement of Pedestrians and Vehicular Traffic and Parking.
Zoning regulations of the Town of Stratford require two parking spaces per residential apartment unit. As stated by Mr. Gary Lorentson, the Town of Stratford planning and zoning administrator, at the defendant's meeting of December 11, 1995, the site plan shows the delineation of walkways and driveways. The site plan also shows forty parking spaces for occupants plus an additional eight parking spaces located in Bridgeport. There is no evidence in the record that the internal movement of pedestrians and vehicular traffic, as shown on the revised site plan, or the number of parking spaces, as shown on the revised site plan, are not adequate and are not safely designed to prevent traffic and pedestrian hazards both on and off the site. There is no evidence in the record that substantial interest in public health, safety or other matters which the commission may legally consider are affected by the internal movement of pedestrian and vehicular traffic or by the number of parking spaces, as shown on the revised site plan. The public interest regarding the eight parking spaces located in the City of Bridgeport can be protected by conditioning approval of the spaces by the Bridgeport Planning Zoning Commission.
D. Emergency Access
There is no evidence in the record that the emergency access, as shown on the revised site plan, is not adequate to protect substantial interest in public health, safety or other matters CT Page 8800 which the Commission may legally consider. As a matter of fact, a report from Steve Pihonak, fire marshal, that is marked Exhibit 14, reads as follows:
 THE REVISED MODIFIED SITE LAYOUT PLAN (ATTACHED) 2/9/95 HAS BEEN REVIEWED BY OUR OFFICE AND FOUND TO BE ACCEPTABLE WITH REGARD TO EMERGENCY VEHICLE ACCESS. THE PARKING SPACES HAVE BEEN ELIMINATED IN THE FRONT OF THE BUILDING AND THE ROADWAY HAS BEEN WIDENED FROM 25' TO 32'. A FIRE LANE WILL BE ESTABLISHED AT THE FRONT OF THE BUILDING HOPEFULLY KEEPING A CLEAR SPACE FOR EMERGENCY VEHICLE ACCESS. TWO NEW HYDRANTS WILL BE ADDED, ONE IN THE FRONT OF THE BUILDING (GLASS LOBBY) AND THE OTHER OUT AT SUCCESS AV., THE FIRE DEPT. CONNECTION FOR THE SPRINKLER SYSTEM WILL BE LOCATED NEAR THE SUCCESS AV. HYDRANT. THIS ARRANGEMENT WILL ELIMINATE VEHICLE CONGESTION (THE PUMPER WILL BE STATIONED AT SUCCESS AV.).
E. Landscaping
The court finds that the modified site layout plan shows that the landscaped area will be 7600 square feet. That amounts to 24 percent of the total lot area. This is shown on the revised PR.1, dated November 6, 1995. The original site layout plan shows where the areas of landscaping were to be located. The applicant is also required to submit a landscaping plan for approval to the Commission prior to the issuance of building permits, as required by § 26.a of the proposed affordable housing opportunity zone. The court finds that the landscaping reason cited for the Commission's decision is not supported by sufficient evidence in the record.
F. Recreational Area
The recreational areas for this proposal include both a roof top recreational area of 6200 square feet as shown on drawing PR.6, dated November 6, 1995, to the proposed development, as well as showing a meeting room on the first floor of the proposed building shown on drawing PR.4, dated May 2, 1994. The court finds that this reason cited by the Commission is not supported by sufficient evidence in the record.
G. Size of Units CT Page 8801
The proposal by the applicant was for each unit to be 720 square feet. Commission members expressed concern that the units were too small. The court has reviewed the existing zoning regulations of the Town of Stratford. The one family residential district designated as RS allows for a one bedroom dwelling unit to be 750 square feet. The two family district zoning of the Town of Stratford designated as RM-1 provides in § 5.3.2 apartment requirements as follows. At least two-thirds of the of the apartments in any residential apartment development shall have not more than three rooms. Each apartment shall contain a bathroom, equipped with a water closet, wash basin, and a bathtub or shower, a kitchen or kitchenette equipped with a sink and provided with facilities and space for cooking range and refrigerator, at least one room shall be not less than 200 square feet in area, and, if the apartment shall have three or more rooms, one additional room which shall be not less than 100 square feet in area. No room in any apartment, other than the bathroom, shall be less than 80 square feet in area. It is clear from this definition of § 5.3.2, that an apartment in a two family district RM-1 with 720 square feet of total area more than meets the definition of 5.3.2. This court concludes that it is not necessary to have more than 720 square feet of living area for each unit in order to protect substantial interest in public health, safety or other matters which the Commission may legally consider.
H. Density
The following chart submitted by Gary Lorentson, planning 
zoning administrator, compares density of Success Senior Residence to Elderly Housing Projects.
 DATE: FEBRUARY 28, 1995 SUBJECT: DENSITY COMPARISON OF SUCCESS SENIOR RESIDENCE TO ELDERLY HOUSING PROJECTS FROM: GARY LORENTSON, PLANNING ZONING ADMINISTRATOR TO: ZONING COMMISSION
PROJECT ZONE ACREAGE NO. DENSITY DENSITY PERCENT UNITS OF PROJECT ALLOWED OF ALLOWED (DU'S/ACRE) BY ZONE DENSITY
SHILO GARDENS RM.1 4.22 60 14.21 11.61 122% LUCAS GARDENS RS-4 4.30 53 12.32 5.80 212% CT Page 8802 ELM TERR. APTS RM-1 4.39 50 11.38 11.61 98% ROBERT KENNEDY APTS. RM-1 4.60 75 16.30 11.61 140% BALDWIN APTS. RM-1 4.37 72 16.47 11.61 142% TOTAL 21.88 310 AVERAGE 4.37 62 14.07 10.45 143%
PROJECT AS APPROVED BY ZBA ON MARCH 17, 1989 CA 0.72 14 19.3 11.61 166%
PROJECT AS DENIED W/O PREJ. BY ZONING COMMISSION ON NOVEMBER 9, 1992 CA 0.04 16 39.7 11.61 342%
PROJECT AS PROPOSED SUCCESS SENIOR RESIDENCE CA 0.73 48 65.3 11.61 562%
Required lot area, width, yards, coverage and height comparison of existing zoning regulations to applicant's site plan are as follows:
District Lot Min. Min. Min. Min. Min. Max. Max. Area Lot Lot Front Side Rear Bldg. Bldg. Sq. ft. Width Depth Yard Yard Yard Cov. Hgt. RS-1 40,000 150 ft. 125 ft. 40 ft. 35 ft. 35 ft. 10% 30 ft. RS-2 20,000 100 ft. 125 ft. 30 ft. 20 ft. 35 ft. 15% 30 ft. RS-3 10,000 100 ft. 90 ft. 25 ft. 12 ft. 30 ft. 20% 30 ft. RS-4 7,500 60 ft. 90 ft. 20 ft. 10 ft. 25 ft. 20% 30 ft. RM-1 7,500 60 ft. 100 ft. 15 ft. 10 ft. 25 ft. 33-1/3% 30 ft. or as specified in 5.3.4 CA 7, 500 60 ft. 100 ft. 10 ft. 32 ft. 50% 35 ft. Proposed Development 31, 978 54.2 ft. 145 ft. 20 ft. 20 ft. 12.2% 60 ft.
The maximum building coverage under the Stratford zoning regulations is the building area divided by the lot area. The building area of this building is approximately 3900 square feet. The building area is defined under § 1.6 of the Stratford zoning regulations as to ground area enclosed by the outside CT Page 8803 walls of a building together with areas of covered portions, other roofed portions, plus all decks, balconies and other similar structural projections above grade.
Affordable housing developments are permitted uses in a CA zone subject to the requirements of sections 5.4 and 20 of the Stratford zoning regulations.
The plaintiff's proposal will have a density of eighty units per acre based on the amount of square feet located in the Town of Stratford. It will not have unlimited density as the proposal was limited to the forty units shown on the revised site plan. The density comparison submitted by Gary Lorentson, planning and zoning administrator, dated February 28, 1995, was based on a proposed number of forty-eight units. The density allowed by the CA zone that this property is located in is 11.61 units per acre. As a result of reducing the number of units from forty-eight to forty, the density for the proposed project for the total acreage is reduced from 65.3 to 54.8 units per acre. Further, the percentage of the allowed density is then reduced from 562 percent to 472 percent. The court finds that the density reason of 80 units per acre cited for the decision is supported by sufficient evidence in the record. The court further finds that the issue of density is necessary to protect substantial interest in public health, safety or other matters which the commission may legally consider. However, in weighing the issue of whether such public interest clearly outweighs the need for this affordable housing approval, the court finds that the public interest does not outweigh the need for this affordable housing approval.
I. Section 20 of the Existing Zoning Regulations
The concern that the Commission has, in this regard, as stated by its brief dated July 15, 1996, is as follows:
 Further, no reference is made to Section 20 of the current zoning regulations which was designed and implemented specifically to address health, safety and welfare considerations.
The court is not persuaded by that concern. The Commission already has the authority under § 8-30g (c)(1)(B) to deny an application if it proves that based on evidence in the record compiled before it that the decision is necessary to protect substantial interest in health, safety or other matters which the CT Page 8804 Commission may legally consider.
This court, therefore, concludes that the denial based on the lack of incorporation of Section 20 into the proposed affordable housing regulation is not necessary to protect a substantial interest in public health, safety or other matters which the commission may legally consider.
J. Building Height
The proposed height of this building is 60 feet based on the revised application. The CA zone in which this property is located allows for a maximum height of 35 feet. The height of a building is necessary to protect substantial interest in public health, safety or other matters which the Commission may legally consider. However, the defendant has not met its burden of proving that the increased height of the building from 35 feet to 60 feet outweighs the need for this affordable housing approval.
K. Sewage Disposal and L. Storm Runoff
There is sufficient evidence in the record to support the Commission's concerns regarding sewage disposal and storm runoff. A staff presentation made to the Commission regarding this proposed affordable housing development, dated August 22, 1995, marked as Exhibit 17, includes the following letter from the Water Pollution Control Authority of the City of Bridgeport, dated August 1, 1995:
 Mr. Gary Lorentson Town of Stratford, Town Hall 2725 Main Street Stratford, CT 06497
 Re: Elderly Housing Project Success Senior Residence Prepared by Katinger, Architects Planners Inc. Dated: 5/02/94
Dear Mr. Lorentson:
 The staff of the WPCA for the City of Bridgeport has made a preliminary review of the reference project with comments as follows:
 Plans relating to the project were received in this office on August CT Page 8805 1, 1995 (revised 2/20/95 through 3/28/95) without any prior review or approval of a proposed connection to the City of Bridgeport Wastewater Collection System.
 Past history indicates the area of the proposed connection to have system capacity limitations due to the building density in that area.
 Storm drainage proposal has not been reviewed by City of Bridgeport Engineering Department.
 Approval for this project connection cannot be provided until the staff of the WPCA has made a detailed review of consultant's flow calculations as they relate to the capacity of the existing system.
 We trust that the foregoing clarifies the WPCA's position on the proposed project.
Very truly yours,
 Lawrence F. Keane, P.E. Manager, Treatment/Field Operations
 LFK/sc cc: Sally Bevilacqua (Resident Engineer) File: 8000
The court further finds that the denial by the Commission on the grounds of sewage disposal and storm runoff is necessary to protect a substantial interest in public health, safety or other matters which the Commission may legally consider. The public interest in sewage disposal and storm runoff clearly outweigh the need for this affordable housing approval. However, the issues of sewage disposal and drainage and The public interest in these issues can be protected. In the West Hartford case, the court concluded that the applicant had demonstrated that its proposal constituted an affordable housing development based on the proposal being "assisted housing" under § 8-30g (a)(1). Evidence had been presented that the defendant's proposal had received an $11,600 interest-free loan from the department of housing and that it was likely that it would received governmental financial assistance for construction. The decision in the West Hartford
case went on to state in part at page 524 as follows:
 Moreover, to have ensured that the appeal provisions of § 8-30g
CT Page 8806 were not fraudulently utilized, the defendant could have conditional approval of the plaintiff's application upon the receipt of the promised funds.
So too, in this case, the Commission could have conditioned approval of the plaintiff's application upon the plaintiff receiving approval from the Water Pollution Control Authority of the City of Bridgeport to connect into its system. This court, therefore, concludes that the public interest can be protected by conditioning approval by the City of Bridgeport Water Pollution Control Authority to connect into its sewage and storm drainage system.
Part of the defendant Commission's concerns with this proposed development as stated in the defendant's brief were as follows:
 The stated purpose of the Plaintiff's regulation is to promote elderly affordable housing at high density rates by minimizing site development costs (Section 26.1). However, a review of these regulations indicate that there are no standards concerning the number and location of driveways, traffic signalization, internal vehicle and pedestrian movement, and landscaping/buffering requirements or recreational space. Further, no reference is made to Section 20 of the current zoning regulations which was designed and implemented specifically to address health, safety and welfare considerations. The Commission found that the proposed regulations contained nothing more than general policy considerations that would not offer any guidance in making an objective assessment of the Plaintiff's site plan. Despite the number and type of deficiencies noted by the Commission in its initial Memorandum of Decision, the Plaintiff made no attempt to modify his site plan or proposed regulations to account for the Commission's concerns about health and safety.
 The obvious difficulty that the Commission had with this proposal is that all of the information missing from the regulations with regard to development standards had to be inferred from the site plan. Moreover, the regulations require the Commission to approve a site plan for an affordable housing development as long as the "standards" set forth in Section 26 are met. However, there are no "standards" set forth. There is no method of calculating density; there is no method for calculating the number and placement of parking spaces; there is no method indicated for calculating the areas reserved for recreational space or buffer zones; there are no requirements regarding sidewalks. About the only "standard" that can be gleaned from the CT Page 8807 Plaintiff's regulations is that the entire site may be covered by impervious surfaces and that it may be of unlimited density. Although there are some requirements for lot coverage and setbacks, the Commission found these highly objectionable because they essentially permit a skyscraper to be placed upon a postage stamp.
The court is not persuaded by that argument. The Commission felt that by approving the proposed zoning regulations the applicant would then not be bound by all the information shown in the site plan that was submitted and as revised. As a matter of fact, the applicant is bound by all of the information shown in that site plan. In order that there not be any dispute or misunderstanding in that regard, this court will order as part of its approval that all of the information shown on the site plan as revised be complied with by the applicant unless the defendant Commission allows any amendments thereto.
The court further finds that the defendant Commission has not met its burden of proving that the combined reasons for its decision regarding traffic, internal movement of pedestrian traffic and vehicular traffic and parking, emergency access, landscaping, recreational areas, size of units, density, the failure to incorporate § 20 of the existing zoning regulations, or building height, outweigh the needs for this approval, subject to modifications and revisions. Further, the public interest in public health regarding sewage disposal and storm runoff, can be protected by granting approval conditioned on obtaining approval from the Bridgeport Wastewater Collection System regarding sewage disposal and drainage, as well as obtaining approval from the Bridgeport Planning Zoning Commission regarding parking spaces shown on the applicant's site plan that are located in the City of Bridgeport.
Under the provision of § 8-30g (c), the trial court is permitted to wholly or partly revise, modify, remand or reverse the decision from which the appeal was taken in a manner consistent with the evidence and the record before it in the event the Commission does not satisfy its burden of proof. The court, accordingly, sustains the appeal subject to the following modifications and revisions:
1. The approval of the application is conditioned upon the City of Bridgeport Wastewater Collection System granting authority to the applicant to connect into its sewer system and storm drainage system. CT Page 8808
2. The approval is conditioned upon the Bridgeport Planning Zoning Commission approving of the parking spaces shown on the applicant's site plan that are located within the City, v of Bridgeport.
3. The proposed zoning regulations provides in § 26.2 (C) as follows:
 The developer or its successor may change the designation of which units within the development shall be set aside as affordable, provided that the minimum twenty-five percent (25%) set aside shall be maintained, and the development as a whole shall continue to comply with all paragraphs of this section.
That section is revised so as to require that once a unit has been sold containing convenants and restrictions which shall require that such dwelling unit be sold or rented at or below prices which will preserve the units as affordable housing as defined in § 8-39a of the Connecticut General Statutes for persons and families whose income is less than or equal to 80 percent of the area median income or state median income, whichever is less, for at least thirty years after the initial occupation of the proposes development, then such unit that has been so designated may not have its designation changed within such thirty year period.
4. The applicant is required to submit a landscaping plan for approval of the Commission prior to the issuance of building permits as required by § 26.8 of the Affordable Housing Opportunity Zone. The approval of the landscaping plan is limited to the size and type of trees in the area for landscaping shown on the plan identified as PR-1, dated May 2, 1994.
5. The transcript of the meeting of the public hearing held on August 22, 1995 included a presentation made by the architect for the applicant. On pages 39, 40 and 41 of the transcript, the architect made various representations regarding the proposed application. All of those representations are ordered to be complied with including but not limited to the following: (a) common support spaces on the first floor including large meeting room and laundry for all tenants to use and kitchen for meetings on first floor and in the rear of the first floor administrative offices for maintenance offices, as well as a minimum of two bathrooms on the first floor as well as a secondary stairwell; CT Page 8809 (b) underground utilities; (c) storm drainage easement; (d) approximately 24 percent of the site not being developed or paved and therefore available for lawn areas, and tree areas; (e) site lighting; (f) driveway width; (g) exterior of the building to be precast concrete insulated panels; (h) recessed windows operable to allow for various ventilation; (i) extensive glass area in entrance of building; (j) elevators;(k) building to be constructed of entirely of noncombustible construction, either steel or concrete frame of columns and beams; (l) floors to be developed out of precast concrete or poured and placed concrete; (m) exterior walls to be insulated panels; (n) interior petitions to be steel-studded sheet rock; (o) building to be fully sprinklered, as well as alarmed, as required by state code; (p) an elevator equipment room and a refuse room at the main entry; (q) each apartment to be a minimum of 720 square feet and to consist of a single bedroom and a clothes closet, a combination living/dining area, a bathroom and linen closet, as well as a small service type kitchen with all the appliances, as well as an additional storage area for the apartments; (r) recreation area on the roof of the building.
6. The applicant is required to maintain the easement granted to it by the Housing Authority of the Town of Stratford to allow for emergency vehicle passage on its property located at 175 Henry Avenue, known as Shiloh Gardens. Said easement is for the applicant's proposed development contiguous to Shiloh Gardens. The easement was granted in consideration of the easement the applicant granted to the authority for tenant passage, and in the interest of quick emergency response which will also enhance protection for the authority's property.
7. The applicant is required to comply with all of the comments made by Steve Pihonak, fire marshal, in his memorandum of February 14, 1995, marked as Exhibit 14. Those requirements have to do with parking spaces, a fire lane, and two new hydrants to be added.
8. The applicant is required to comply with all information shown on the revised site plans including but not limited to limiting occupancy of the units to elderly persons and senior citizens as defined in § 26.1.1 of the AHOZ and completing all work in connection with the site plan within five years after final approval of the plan. The date of final approval of the plan is the date that the applicant has received all of the final approval: CT Page 8810
 (a) approval from the defendant Zoning Commission of the landscaping plan;
 (b) approval from the City of Bridgeport Wastewater Collection System granting authority to the applicant to connect into its sewer system and storm drainage system; and
 (c) approval from the Bridgeport Planning Zoning Commission approving of the parking spaces shown on the applicant's site plan that are located within the City of Bridgeport.
Axelrod, J.